will be Ross v. Commissioner of Social Security. May it please the Court. Good morning, Your Honors. I'm Peter Helwig. I represent Robert Ross, the appellant, Social Security claimant in this case. Mr. Ross is a 23-year veteran of the U.S. Armed Forces who saw combat duty in Iraq and as a result came away with post-traumatic stress disorder, which I'll refer to as PTSD. He filed a claim for Social Security benefits and as part of that claim, the medical opinion of his treating psychiatrist was submitted to the Social Security Administration. However, the administrative law judge, rather than following the general rule that's well established, the treating provider's medical opinion is entitled to substantial weight, decided instead to give her opinion no weight. And the reason he did that, he said, was relying on an exception to the general rule, which says that if the treating provider's opinion is inconsistent with her own examination notes, then he does not have to give it substantial weight. The administrative judge reasoned that the opinion was not consistent with medical notes because on numerous occasions, Dr. Sabin saw Mr. Ross and he was doing fine and she reported in her notes that he was doing okay. On other occasions, he was doing poorly and she reported that in her notes. The administrative law judge ruled that that amounted to records that are inconsistent with a finding of disability. The problem with that and the issue in this appeal is that how do you treat a psychological disorder that is by its very nature episodic? That you have good days and bad days and you may report to your doctor one day and be feeling great and then two weeks later, you may have had a flashback or some kind of a breakdown and the notes reflect that you're doing terrible. So we filed this appeal relying on case law from other jurisdictions and on the unreported decision of this court in the Mace case, arguing that where the disability is episodic, the fact that there are some days where there is no examination reports that there are no issues that day does not by itself establish that there's no disability. We made that argument and then after the briefs were filed, the decision in Schenck v. Commissioner came down and we filed a notice of supplemental authority and the Social Security Administration responded. What the Schenck decision did essentially is adopted the reasoning of the cases we cited. If I can find my glasses, I'll be more specific. In the Schenck case, they had a claimant who had bipolar disorder and the same argument was made by Social Security that the fact that her or his medical records did not show a consistent pattern of problems all the time showed that the doctor's medical opinion should not be followed. The court in Schenck said that the fact that Schenck at times seemed to be doing better does not support rejection of evidence of bipolar disorder. Rather, the court said these ups and downs reflect the episodic nature of bipolar disorder, precisely what we're arguing in this case except as to what evidence do we have here about just how bad the downs were. I think in Schenck, the downs were fairly characterized as pretty extreme. What evidence do we have here? Pretty extreme here too, Your Honor. One of the consultative examiner, Dr. Gluck, found that Mr. Ross had daily traumatic memories of events involving actual threatened or personal harm to which he responded with intense fear, helplessness, and horrors. That he had nightmares and dreams of distressing events every day. That he had distressing recollections every day, including those of a friend shot in front of him and of a little girl who blew herself up in front of him during his wartime service. He found that he acts and feels as if he were back in that situation when these things occur, that he's hypervigilant with an exaggerated startle response. His treating psychologist observed that he's easily irritated, has significant hypervigilance, has many triggers based on his combat experience and can have flashbacks at any time. And the triggers can prompt him to act out that combat experience by putting himself back in that situation or to bunker down and just shut down and not deal with anyone. She said that in her testimony. Yes. About bunkering down and also about he was so bad that I could have hospitalized him. But I looked at all of those treatment notes and there were 37 of them. And I did not see any indication in the treatment notes. And they are not just talking about how he is right then. They're talking about she reported, you know, how he went to these court proceedings and how he had the police and child custody people come late at night and so forth. I saw no indication in those treatment notes that he ever reported or she ever made any note of any bunkering down or any so bad that she might have to hospitalize him. Is there any place else other than the treatment notes where there might be some corroboration of that? As Your Honor pointed out, it's in your testimony also. But let me point out some elements of her treatment notes which do in fact indicate. Can we just talk about the bunkering down for a minute before you go on to that? Certainly. There was a group therapy session where he discussed the effects of his PTSD and how he had not been able to sleep and he stated that he was being a hermit. Is that consistent with Dr. Sabin's statement that he bunkered down? It is, yes. I think so. Now you may go on. Bunkering down basically is withdrawing and not dealing with the outside world, taking cover. It wasn't in her notes but it was in notes that were in the record. Yes. Other notes in the record, the very first exam with Dr. Sabin, she reports that he was depressed, he was stressed, he was in an anxious mood. He reported increasing anxiety, hypervigilance, disturbing dreams, paranoia, and sleep problems. That was on June 15th and it's page 905 of the record. On July of 2011, Dr. Sabin again reported he had an anxious mood, a restricted affect, reported increasing nightmares, vigilance, anxiety, depression, and agitation. That's on pages 696 to 99 of the record. On October 12th of 2011, she observed, Dr. Sabin observed that he was angry and tearful and overwhelmed. That he reported an increase in anger and anxiety and nightmares and intrusive thoughts. That he had the image of the little girl blowing up in front of him. That he remembered and relived picking up a friend's remains after he had been killed by an IED. On that examination, Dr. Sabin administered the PTSD questionnaire, which is a well-recognized instrument for identifying levels of PTSD. He scored a 66 on that. It's on a scale of 17 to 85 and anything over 48 is considered an indication of PTSD. He had 66. On another occasion, May 14th, 2014, she observed him to be depressed and tearful. He had a global assessment of functioning of 51, which indicates right on the border between moderate and serious mental problems. And he reported increasing paranoia and agitation and irritability and nightmares. What date was that? That was May 14th, 2012 and it's page 874 of the record. I don't know if I gave you the page number for the date when she administered the instrument and that's page 890 of the record. On April 19th, 2003, she observed that his mood was anxious and he reported that the Boston Marathon bombing, which had recently occurred, had triggered memories of his wartime service with intrusive thoughts of combat, loss of life, and severe injuries. In the brief, we cited to page 850 of the record and I noticed in preparing today, that's a mistake, it's at page 852. Some of the information in those medical reports is based on Dr. Sabin's observations and some of it is based on self-reports, reports of Mr. Ross. And we cited to the Keaton case on page 46 and 47 of our brief, an unpublished decision of the Sixth Circuit, but supported by citations to reported decisions of the Sixth and D.C. Circuits, which basically says that mental disorders cannot be ascertained and verified as our most physical illnesses because they are generally not revealed by objective medical tests such as laboratory analysis. Therefore, it is necessary to place reliance on self-reports because it would be impossible for a doctor to observe the contents of plaintiff's dreams, the intensity of his hallucinations, or his flashbacks. So the medical opinion and the legal opinion from the Keaton case, and the cases cited there, is that self-reports are very valid and sometimes the only available source of what his dreams were, what his hallucinations were, what his flashbacks were, and the like. Is your view that the ALJ disregarded the fact that he had these dreams and hallucinations and so on and so forth, or that she disregarded the fact that those made him unable to work? I think she thought, I think the ALJ, it was male, the ALJ decided that he was lying. The ALJ found that he found Mr. Ross' testimony to be not entirely credible. Was there, I didn't see where the specific statements the ALJ found not credible were ever specified. Can you identify specific statements or symptoms that the ALJ found not credible? Let's see. May I do that on my rebuttal? I'll find it while the council is speaking. You may. Looks like we are at that moment. Thank you. May it please the court, Leah Holzberger for the commissioner. This case is about a claimant who had an active, robust lifestyle. He worked as a skydiving instructor, taught motorcycle endorsement classes, and cared for his infant granddaughter all during the period of time when he claimed to be disabled. This case also has a date last insured issue. The claimant retired from the Army in September 2007 and alleged his disability began that same month. His earning record shows he acquired sufficient quarters of coverage to remain insured through June 30, 2013. He must prove that he became disabled prior to this date to be entitled to benefits. Here, the court can affirm the ALJ's decision that claimant was not disabled because substantial evidence supports the ALJ's decision to assign limited weight to the opinions of treating psychologist Dr. Stuart Sabin and the ALJ's finding that claimant's subjective complaints were not entirely consistent with the evidence of record. I'd like to turn to claimant's first argument about the nature of episodic mental impairments. There is no per se rule that says episodic mental impairments preclude work. That's just not true. A diagnosis is not a disability. Contrary to claimant's argument, evidence of intermittent periods of improvement and documented in a treating source's notes can be good cause to discredit a treating source's opinion as this court found in the Phillips case and in the Crawford case, which we believe is controlling here. In Phillips, the court found that there was substantial evidence to support the ALJ's decision to give little weight to a treating physician opinion when it conflicted with treatment notes and claimant's testimony about activities. Similarly, in Crawford, this court found that there was substantial evidence to support the ALJ's decision to discount a consultative psychologist opinion that a claimant had marked psychological limitations about his reactive depression. In the Schink case, we said it's not enough merely to point to positive or neutral observations that create at most a trivial and indirect tension with the treating physician's opinion. By proving no more than the claimant's impairments are not all-encompassing. It seems to me that Dr. Sabin's opinions included that he had severe sleep deprivation, trouble recalling or learning when he's experiencing stress, he experienced flashbacks, intrusive thoughts, and some of the things that your opponent outlined here today. You argue that her treatment notes contradicted her opinions because they show that he was alert, oriented, good contact, had good judgment, etc. But she didn't opine that he always experienced those symptoms. Explain to me why there's an inconsistency between her notes and her opinion. Because her opinion said that he could not be around other people and he couldn't be around big groups of people and other individuals and that's why he was considered to be disabled. That's what she testified to at the ALJ hearing. Did her opinion say he couldn't ever be around other people or he couldn't usually be around other people? Or did it say that he sometimes couldn't be around other people? It said that he couldn't be around others in groups and that he had trouble being around individuals. But that's why the ALJ, in his mental limitations in the RFC, limited the claimant to routine, repetitive tasks only, no public contact, and occasional interaction with coworkers. So the ALJ effectively accepted that he couldn't be around other people, at least not on a regular basis. That's true, Your Honor. Which is a substantial distinction from Schenck because in Schenck, the ALJ actually found he could return to his prior work as a car salesman. And the court also criticized the ALJ because the ALJ did not take into account the mental limitations in the RFC at all. That's exactly right, Your Honor. In Schenck, the ALJ, in that case, found that there were no severe mental limitations whatsoever at Step 2. But here, in this case, the ALJ found that the claimant had severe mental limitations and he continued to analyze those throughout the steps, the sequential steps of the evaluation. So any implication that an ALJ cannot consider normal exam findings when determining the weight to give medical opinion is simply not true. Let me ask you about the ALJ made a statement that the claimant had global assessment functioning ratings of between 55 and 60. But I counted something like, let's see, 1, 2, 3, 4, 5, 6, about 10 appointments where Dr. Sabin noted that he had a score below 55. But the ALJ didn't seem to acknowledge that evidence at all. Your Honor, the Social Security Administration doesn't recognize GAF scores as indicative of anything in particular. Well, that's true, but the ALJ relied on that evidence. It seems to me if it relies on it in any way, then it has to look at the entire record as far as that evidence goes. Isn't that right? Yes, and the ALJ did look at the entire record when making the determination to give limited weight to the opinions of the treating psychologist and took into account that opinion that she gave at the ALJ hearing that he had problems being around other people. But in failing to discuss the scores of 50 or lower than 55, it appears that the ALJ may have cherry-picked the evidence, accepting the evidence in favor of the opinion and disregarding the other evidence. Well, the ALJ does not have to cite to every single finding in the record, according to Dyer v. Barnhart. The ALJ, in this case, relied on three different things to find that he assigned limited weight to the treating psychologist opinion first. He looked to the activities that the claimant was being able to do on a regular basis, and he looked to the normal exam findings, and he also looked to the conservative treatment. According to the record, the claimant was a skydiving instructor, motorcycle class instructor, cared for his granddaughter, socialized with friends in person and over the phone, attended church weekly, and engaged in volunteer work with troubled adolescents, and that's on page 861 of the record. As to the normal exam findings, Dr. Stuart Sabin consistently found that he had good eye contact, he was alert, fully oriented and cooperative, with intact recent remote memory, good concentration and judgment, no abnormal motor activity or perpetual disturbances, and he actually had an improvement of his PTSD symptoms when his daughter moved out of the house. As far as the conservative treatment, the ALJ noted that he had bimonthly therapy sessions and medication management with very few adjustments, but that he had no hospitalizations. So all of these findings provide substantial evidence to support the ALJ's decision to give a limited weight to the treating psychologist, and it supports the ALJ's finding that claimant's subjective complaints were not entirely consistent with the evidence of record. If there are no further questions, I'll conclude that the threshold for evidentiary sufficiency in social security cases is not high, according to the Supreme Court's recent decision in Beestick v. Berryhill, 139 Supreme Court Reporter 1148 in April 2019. Because substantial evidence exists in the record to support the ALJ's factual findings and ultimate conclusion, this court should affirm the commissioner's decision. Thank you. Let me ask you one more question. Yes, Your Honor. One of Dr. Stewart-Saban's opinions was that Mr. Ross's PTSD was severe or very severe. Do you agree that the ALJ found, in fact, that the PTSD was severe at step 2 of the analysis? Yes, Your Honor. The ALJ did find that the PTSD was a severe impairment, and that's on page 22 of the record. Okay, so the issue of whether the PTSD was severe isn't at issue in this appeal, is it? That's true. That's a distinction from Schenck. The ALJ found finding number 3 on page 22 of the record that one of his severe impairments was a post-traumatic stress disorder. As far as the conservative treatment, it seems to me this case is very different from Fernandez's because here Ross was treated both with medication, which was changed with some regularity. He had the individual therapy sessions. He also had the weekly group therapy sessions. And further, Dr. Stewart-Saban testified that in therapy appointments she could only go so far with him on certain subjects because of the trauma that it induced. That's true, Your Honor, but also in Fernandez, the court pointed out that the psychiatrist, the treating psychiatrist in that case, had many positive findings regarding the claimant's mental impairments that his mental state included being able to interact with others. So Fernandez is actually very similar to this case. Nothing further, Your Honors. Thank you. Thank you. Thank you. Just to respond to the court's question earlier, the administrative law judge's reasoning for not believing Mr. Ross in terms of his statements about the severity of his limitations is at the top of page 31 of the record, and it's basically talking about he didn't get any, the assertion that was just discussed in the colloquy where they say the ALJ found that he only tried limited treatment. Also that he had an active lifestyle to some extent in that he was meeting with veterans groups, that he was teaching veterans in a motorcycle class, and that sort of thing. And in that case, the Schenck case speaks to us as well at 935 F. 3rd 1266, where it says that if a person is active in a protected setting, such as among, let me get the language right, in familiar surroundings with familiar or no people, the ALJ, the Social Security, is required to look at whether his level of functioning in that protected setting is transferable to a normal competitive work situation, 40 hours a week, showing up on time, not missing days, that sort of thing. Here, there were a lot of activities that were not protected. The weekly church, that may be a little protected because it's church and he knows them perhaps, but the court sessions were obviously stressful. They were, and he went to pieces in those court sessions. On one court session, he had to be escorted out, but then he met with the judge, and that same judge actually awarded custody to him two months later. And he had the honor guard activities and the teaching activities, which were only four or five times a year, but they were three days or two, three days and two, three hours teaching, so that they were pretty substantial, it seems to me. If I recall correctly, those were, and the record indicated those were with veterans, the teaching, the motorcycle riding skills. That's right, that's right. The question still, I think, is, I think the court, given the fact that many of these things were in a protected setting and some were, as your honor indicated, maybe sort of in between, like the church, the ALJ had an obligation to... The court was not protected at all, nor were the, when the child services people and the police came to his house late at night, those were not protected. And he worked with neighbors to deal with the flood situation. I think those are classic PTSD situations. In the court situation, he went berserk, and then he calmed down later. In the child protective service thing, it made him extremely upset and angry, and he freaked out, but then he calmed down the next day and dealt with it. I didn't see any notations where he freaked out when the people came at night. Well, that's my word. I admit that's my word, but I think the record indicates that he behaved badly when that occurred. Is his time as a skydiving instructor at issue at all here? I'm sorry? Is his time as a skydiving instructor at issue? I don't think so. You know, that was right after he returned. At the beginning of his PTSD, he did it for a short time and then stopped, and I don't think there's anything in the record as to why he stopped. But it wasn't something that was ongoing, and it wasn't something that continued much into the period after the, as we approach the date of, I'm sorry, it happened after the date of onset, but it did not continue for long periods of time before the last date ensured. Do you know how long? The record indicates it was a few months. I'm not sure if I can put my hands on a citation to it. Oh, I'm over? Oh. Yes. We've got your argument, counsel. Thank you. Court will be adjourned until 9 a.m. tomorrow morning. Thank you.